| Fill in this information to identify the case: |
|---|
| Debtor 1   Keith Porter |
| Debtor 2 (Spouse, if filing) |
| United States Bankruptcy Court   Northern District of Illinois |
| Case number:   18-27755 |

FILED
U.S. Bankruptcy Court
Northern District of Illinois
10/18/2018
Jeffrey P. Allsteadt, Clerk

EXHIBIT A

## Official Form 410
## Proof of Claim

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1: Identify the Claim

**1. Who is the current creditor?**
Edgewater Community Association, Inc.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**
☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?
Edgewater Community Association, Inc.
Name
Keay & Costello, P.C.
128 S. County Farm Road
Wheaton, IL 60187

Contact phone ____630-690-6446____
Contact email ____ben@keaycostello.com____

Where should payments to the creditor be sent? (if different)
Name _____

Contact phone _____
Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):
_____

**4. Does this claim amend one already filed?**
☑ No
☐ Yes. Claim number on court claims registry (if known) _____   Filed on _____
                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes. Who made the earlier filing? _____

Official Form 410    Proof of Claim    page 1

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. How much is the claim? | $ 2246.05  Does this amount include interest or other charges?<br>☐ No<br>☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Association common expense |
| 9. Is all or part of the claim secured? | ☐ No<br>☑ Yes. The claim is secured by a lien on property.<br>**Nature of property:**<br>☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** Association lien<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property: $ 225000.00<br>Amount of the claim that is secured: $ 2246.05<br>Amount of the claim that is unsecured: $ 0.00  (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition: $ _____<br><br>Annual Interest Rate (when case was filed) ____ %<br>☑ Fixed<br>☐ Variable |
| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410      Proof of Claim      page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. Check all that apply: | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies. | $ |
| | * Amounts are subject to adjustment on 4/1/19 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   10/18/2018
                    MM / DD / YYYY

/s/ Benjamin J. Rooney
Signature

Print the name of the person who is completing and signing this claim:

Name    Benjamin J. Rooney
        First name   Middle name   Last name

Title

Company   Keay & Costello, P.C.
          Identify the corporate servicer as the company if the authorized agent is a servicer

Address   128 S. County Farm Road
          Number   Street
          Wheaton, IL 60187
          City   State   ZIP Code

Contact phone   630-690-6446      Email   ben@keaycostello.com

Official Form 410   Proof of Claim   page 3

DATE: 10/18/18 TIME: 10:53 AM              **EDGEWATER COMMUNITY ASSOCIATIO**                       Page: 3

**FINANCIAL TRANSACTIONS - 10/18/18**

902 Northside Drive
Keith Porter
Unit ID: 62103
STATUS: 50 - Attorney Action
PREPAID BAL:   0.00

| DATE | PAYMT AMT | CHECK # | DEP DT | CODE | N/A | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 060118 | | APPLY CHARGES | | A1 | | ASSESSMENT | 277.30 | 893.98 |
| 062018 | | APPLY LATE FEE | | 01 | | Late Fees | 25.00 | 918.98 |
| 082118 | | EXPENSE ADJ | | 05 | | Attorney Fees | 332.06 | 1251.04 |
| 091118 | | EXPENSE ADJ | | 05 | | Attorney Fees | 565.04 | 1816.08 |
| 091118 | | EXPENSE ADJ | | 05 | | Attorney Fees | 100.00 | 1916.08 |
| 100118 | | EXPENSE ADJ | | 05 | | Attorney Fees | (10.00) | 1906.08 |
| 100118 | as per attorney | | | | | | | |
| 100118 | | EXPENSE ADJ | | 05 | | Attorney Fees | (90.00) | 1816.08 |
| 100918 | | EXPENSE ADJ | | 05 | | Attorney Fees | 64.97 | 1881.05 |
| 8-31-18 | | Collection Fee | | | | Legal | 65.00 | 1,946.05 |
| 10-18-18 | | BK Legal Fee | | | | | 300.00 | 2,246.05 |

DATE: 10/18/18 TIME: 10:53 AM    **EDGEWATER COMMUNITY ASSOCIATIO**    Page: 2

**FINANCIAL TRANSACTIONS - 10/18/18**

902 Northside Drive
Keith Porter
Unit ID: 62103
STATUS: 50 - Attorney Action
PREPAID BAL:    0.00

| DATE | PAYMT AMT | CHECK # | DEP DT | CODE | N/A | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|---|---|
| 020116 | | APPLY CHARGES | | A1 | | ASSESSMENT | 264.44 | 624.06 |
| 021716 | | APPLY LATE FEE | | 01 | | Late Fees | 25.00 | 649.06 |
| 032116 | 40.00 | 90 | 032116 | A1 | | ASSESSMENT | (40.00) | 609.06 |
| 042516 | 50.00 | 2067109352 | 042516 | A1 | | ASSESSMENT | (50.00) | 559.06 |
| 052316 | 50.00 | 2067109 | 052316 | A1 | | ASSESSMENT | (50.00) | 509.06 |
| 060116 | | APPLY CHARGES | | A1 | | ASSESSMENT | 264.44 | 773.50 |
| 062016 | | APPLY LATE FEE | | 01 | | Late Fees | 25.00 | 798.50 |
| 062716 | 120.00 | 1 | 062716 | A1 | | ASSESSMENT | (120.00) | 678.50 |
| 072516 | 125.00 | 2067109176 | 072516 | A1 | | ASSESSMENT | (125.00) | 553.50 |
| 020117 | | APPLY CHARGES | | A1 | | ASSESSMENT | 264.44 | 817.94 |
| 022017 | | APPLY LATE FEE | | 01 | | Late Fees | 25.00 | 842.94 |
| 031017 | 200.00 | 207233 | 031017 | A1 | | ASSESSMENT | (200.00) | 642.94 |
| 041817 | | EXPENSE ADJ | | 05 | | Attorney Fees | 250.00 | 892.94 |
| 042817 | 602.00 | 2072331600 | 042817 | A1 | | ASSESSMENT | (208.32) | 290.94 |
| 042817 | | | | 01 | | Late Fees | (75.00) | |
| 042817 | | | | 05 | | Attorney Fees | (318.68) | |
| 042817 | 600.00 | 2072331600 | 042817 | 05 | | Attorney Fees | (290.94) | (309.06) |
| 042817 | | | | PP | | Credit-Prepaid | (309.06) | |
| 052317 | | EXPENSE ADJ | | 05 | | Attorney Fees | 309.00 | (0.06) |
| 060117 | | APPLY CHARGES | | A1 | | ASSESSMENT | 264.44 | 264.38 |
| 060117 | | APPLY PREPAYMNT | | A1 | | ASSESSMENT | (264.44) | 264.38 |
| 060117 | | | | 05 | | Attorney Fees | (44.62) | 264.38 |
| 100217 | | EXPENSE ADJ | | 05 | | Attorney Fees | 50.00 | 314.38 |
| 020118 | | APPLY CHARGES | | A1 | | ASSESSMENT | 277.30 | 591.68 |
| 021918 | | APPLY LATE FEE | | 01 | | Late Fees | 25.00 | 616.68 |

R2005087950_1

Prepared by / upon recording please return to:

Jo Anne P. Stubblefield
Hyatt & Stubblefield, P.C.
1200 Peachtree Center, South Tower
225 Peachtree Street, N.E.
Atlanta, Georgia 30303

LAURIE MCPHILLIPS 90P   R 2005087950
Will County Recorder   Page 1 of 90

PC1 Date 05/27/2005   Time 10:47:56
Recording Fees:   184.00

# COMMUNITY CHARTER

## FOR

# EDGEWATER

STEWART TITLE COMPANY
2055 W. ARMY TRAIL ROAD, SUITE 110
ADDISON, IL 60101

1 of 90

(g)  provide a waiver of subrogation against any Owner or household member of an Owner; and

(h)  include an endorsement precluding cancellation, invalidation, suspension, or non-renewal by the insurer on account of any act or omission of one or more Owners, unless acting on the Association's behalf within the scope of their authority, or on account of any curable defect or violation, without prior written demand to the Association and allowance of a reasonable time to cure the defect or violation.

In addition, the Board shall use reasonable efforts to secure insurance policies that provide:

(a)  a waiver of subrogation as to any claims against the Association's directors, officers, employees, and manager;

> 🗝 Subrogation is a legal concept by which one person is substituted in the place of another with respect to a lawful claim or right. For example, once they have paid a claim by an insured party, insurance companies generally have the right to step into the shoes of the insured party and sue anyone that the insured party could have sued.

(b)  a waiver of the insurer's right to repair and reconstruct instead of paying cash;

(c)  an endorsement requiring at least 30 days' prior written notice to the Association of any cancellation, substantial modification, or non-renewal;

(d)  a cross liability provision; and

(e)  a provision vesting in the Board exclusive authority to adjust losses. However, Mortgagees having an interest in such losses may not be precluded from participating in the settlement negotiations, if any, related to the loss.

11.4. Insurance Premiums.

Premiums for all Association insurance shall be a Common Expense as defined in Section 12.1, except that premiums for property insurance on Limited Common Areas assigned to particular Units may be charged as Specific Assessments to such Units as described in Section 12.4, unless the Board reasonably determines that other treatment of the premiums is more appropriate, and premiums for insurance on a Unit which the Association purchases upon the Owner's failure to do so pursuant to Section 6.2 shall be levied as a Specific Assessment pursuant to Section 12.4.

· · ·

# Article 12
# Association Finances

*This Article provides for various types of funding to cover expenses that the Association incurs or expects to incur in exercising its authority and performing its responsibilities under the Governing Documents. The primary source of funding is the assessments which this Article authorizes the Association to levy against the Units and collect from the Owner of each Unit. Assessments are secured by a lien on each Unit as described in this Article.*

~~26~~
32

12.1. **Association Expenses.**

Except as the Governing Documents otherwise specifically provide, all of the expenses that the Association incurs, or expects to incur, in connection with the ownership, maintenance, improvement, and operation of the Area of Common Responsibility, and otherwise for the general benefit of the Owners, are considered "Common Expenses." Common Expenses include such operating reserves and reserves for repair and replacement of capital items within the Area of Common Responsibility as the Board finds necessary or appropriate in accordance with this Charter.

Common Expenses shall not include any expenses incurred during the Founder Control Period for initial development or original construction costs unless the Founder and Members entitled to cast a majority of the total votes in the Association approve such expenditure. Payments due under leases of capital improvements such as street lights shall not be considered an initial development or original construction cost.

The characterization of a particular expense as a "Common Expense" shall not preclude the Association from seeking reimbursement for, or a contribution toward, such expenses from other Persons who may be responsible for the expenses incurred or for sharing such expenses pursuant to this Charter, any Supplement, or any other recorded covenants or agreements.

12.2. **Budgeting for and Allocating Association Expenses.**

(a) *Preparation of Budget.* At least 60 days before the beginning of each fiscal year, the Board shall prepare a budget of the estimated Common Expenses for the coming year.

The estimated expenses shall include, in addition to any operating reserves, a reasonable contribution to a reserve fund for repair and replacement of any capital items to be maintained as a Common Expense. In determining the amount of such reserve contribution, the Board shall take into account the number and nature of replaceable assets, the expected useful life of each, the expected repair or replacement cost, and the contribution required to fund the projected needs by annual contributions over the useful life of the asset.

The budget shall also reflect the sources and estimated amounts of funds to cover such expenses, which may include any surplus to be applied from prior years, any income expected from sources other than assessments levied against the Units, and the amount to be generated through the levy of Base Assessments pursuant to subsection (b).

(b) *Calculation of Base Assessments.* The total budgeted Common Expenses, less any surplus in the Common Expense budget from prior years and any income anticipated from sources other than assessments against the Units, shall be allocated among all Units subject to assessment under Section 12.5 and levied as a "Base Assessment." Base Assessments shall be levied at a uniform rate per Unit subject to assessment under Section 12.5, except that Units which the Founder owns shall not be assessed any portion of the Base Assessment levied to fund contributions to reserve funds and shall not be assessed at all during any period that the Founder has elected to fund deficits pursuant to Section 12.6(b).

33



**Association Funds**
General Operating Fund
Reserve Funds for Repair and Replacement of Capital Items

**Primary Sources of Income**
Base Assessments
Special Assessments
Specific Assessments
Founder Subsidy (if any)
Community Origination Fees
Initial contributions to reserves

**Secondary Sources of Income**
Facilities Rental
Monetary Penalties
Interest on Reserves and Delinquent Assessments
Late Charges

The Founder may, but shall not be obligated to, reduce the Base Assessment for any fiscal year by payment of a subsidy (in addition to any amounts paid by the Founder under Section 12.6(b)). Any such subsidy may be treated as a contribution, an advance against future assessments due from the Founder, or a loan, in the Founder's discretion. Any such subsidy and the characterization thereof shall be conspicuously disclosed as a line item in the income portion of the budget. Payment of such subsidy in any year shall not obligate the Founder to continue payment of such subsidy in future years, unless otherwise provided in a written agreement between the Association and the Founder.

(c) *Notice of Budget and Assessment; Right to Disapprove.* At least 30 days prior to the Board's adoption of any budget, the Board shall send a summary of the proposed budget, together with notice of the amount of the Base Assessment to be levied pursuant to such budget, to the Owner of each Unit responsible for a share of the expenses covered by such budget. The Common Expense budget shall automatically be adopted and become effective on the date stated in the notice unless disapproved at a meeting by Members entitled to cast at least 75% of the total votes in the Association and by the Founder, during the Development and Sale Period. There shall be no obligation to call a meeting to consider the budget except on petition of the membership for a special meeting pursuant to the By-Laws.

If any proposed budget is disapproved or the Board fails for any reason to determine the budget for any year, then the budget most recently in effect shall continue in effect until a new budget is ratified.

(d) *Budget Revisions.* The Board may revise the budget and adjust the Base Assessment any time during the year, subject to the same notice requirements and rights to disapprove set forth in subsection (c) above.

(e) *Surplus Funds.* Any surplus funds of the Association remaining after payment of or provision for all Association expenses and any budgeted allocation to reserves may be used to supplement reserves or taken into account in the income portion of the budget pursuant to which the funds were collected in order to reduce the assessments that would otherwise be levied pursuant to that budget in the succeeding year, as the Board deems appropriate.

12.3. Special Assessments.

The Association may levy "Special Assessments" to cover Common Expenses that are non-routine, unanticipated, or in excess of those anticipated in the applicable budget. Except as otherwise specifically provided in this Charter, any Special Assessment for Common Expenses shall require the affirmative vote or written consent of Members entitled to cast more than 50% of the votes attributable to Units subject to assessment under Section 12.5 and shall be allocated equally among all such Units. . In addition, during the Development and Sale Period, any Special Assessment shall also be subject to the Founder's written consent. Special Assessments shall be payable in such manner and at such times as the Board determines

and may be payable in installments extending beyond the fiscal year in which the Special Assessment is approved.

### 12.4. Specific Assessments.

The Association may levy "Specific Assessments" against a particular Unit as follows:

(a) to cover the costs, including overhead and administrative costs, of providing services to the Unit upon request of the Owner pursuant to any menu of optional services which the Association may offer (which might include the items identified in Section 10.1). Specific Assessments for optional services may be levied in advance of the provision of the requested service; and

(b) to cover costs incurred in bringing the Unit into compliance with the Governing Documents or costs incurred as a consequence of the conduct of the Owner or occupants of the Unit, their agents, contractors, employees, licensees, invitees, or guests; however, the Board shall give the Unit Owner prior written notice and an opportunity for a hearing in accordance with the By-Laws before levying any Specific Assessment under this subsection (b); and

(c) to cover any insurance deductible assessed against the Owner of the Unit pursuant to Section 11.2 and any premium for Insurance on Limited Common Areas assessed against the Unit pursuant to Section 11.4; and

(d) to cover any other amounts that the Governing Documents authorize the Association to charge to a particular Owner or levy against any particular Unit.

### 12.5. Authority to Assess Owners; Time of Payment.

The Founder hereby establishes and the Association is hereby authorized to levy assessments as provided for in this Article and elsewhere in the Governing Documents. Except as otherwise provided in Section 12.2 and Section 12.6 with respect to Units owned by the Founder, the obligation to pay assessments shall commence as to each Unit on the first day of the month following the date on which the Unit is made subject to this Charter or the effective date of the Association's first budget, whichever is later. The Base Assessment levied on each Unit for the year in which the Unit is made subject to this Charter shall be prorated according to the number of months remaining in the fiscal year at the time the Unit becomes subject to the Charter.

Assessments shall be paid in such manner and on such dates as the Board may establish. The Board may require advance payment of assessments at closing of the transfer of title to a Unit and impose special requirements for Owners with a history of delinquent payment. If the Board so elects, assessments may be paid in two or more installments. The Base Assessment is an annual assessment due and payable in advance on the first day of each fiscal year; however, the Board may permit such assessment to be paid in installments. If any Owner is delinquent in paying any assessments or other charges levied on his Unit, the Board may revoke such Owner's privilege of paying in installments and require the outstanding balance on all assessments to be paid in full immediately.

### 12.6. Obligation for Assessments.

(a) *Personal Obligation.* By accepting a deed or entering into a recorded contract to purchase any Unit, each Owner covenants and agrees to pay all assessments authorized in the Governing Documents. All assessments, together with interest (computed from its due date at a rate of 10% per annum or such

R2005087950_36

higher rate as the Board may establish, subject to the limitations of Illinois law), late charges as determined by Board resolution, costs, and reasonable attorneys' fees, shall be the personal obligation of each Owner and a lien upon each Unit until paid in full. Upon a transfer of title to a Unit, the grantee shall be jointly and severally liable for any assessments and other charges due at the time of conveyance.

The Board's failure to fix assessment amounts or rates or to deliver or mail each Owner an assessment notice shall not be deemed a waiver, modification, or a release of any Owner from the obligation to pay assessments. In such event, each Owner shall continue to pay Base Assessments at the rate of assessment established for the last year for which an assessment was made, if any, until a new assessment is levied, at which time the Association may retroactively assess any shortfall.

No Owner may exempt himself or herself from liability for assessments by non-use of Common Area, abandonment of his or her Unit, or non-use of services provided to the Units. The obligation to pay assessments is a separate and independent covenant on the part of each Owner. No diminution or abatement of assessments or set-off shall be claimed or allowed for any alleged failure of the Association or Board to take some action or perform some function required of it, or for inconvenience or discomfort arising from the making of repairs or improvements, or from any other action it takes.

> By acquiring a Unit in Edgewater each Owner agrees to pay all assessments levied against his or her Unit. If the Owner does not pay on time, the Owner will be charged late fees and interest on all past due amounts. Owners may not reduce their assessments because of any action or inaction by the Association.

(b) *Founder's Financial Obligations to Association.* Subject to Section 12.2, the Founder shall be liable for assessments on any Units it owns that are subject to assessment under this section, except that during the Development and Sale Period, the Founder may satisfy its obligation to pay Base Assessments and Special Assessments for Common Expenses on Units it owns either (i) by paying such assessments (exclusive of any portion levied to fund contributions to reserve funds) in the same manner as any other Owner, or (ii) by paying any shortfall in actual expenses (excluding contributions to reserve funds) under the Common Expense budget resulting from events other than failure of other Owners to pay their assessments, the amount of any such shortfall determined after allocating to reserves that portion of the assessments actually collected from other Owners for purposes of funding reserve accounts.

Regardless of the Founder's election under this section, any of the Founder's financial obligations to the Association may be satisfied in the form of cash or by "in kind" contributions of services or materials, or by a combination of these.

(c) *Assessment Statement.* Within 30 days after receipt of a written request from any Owner, Mortgagee, prospective Mortgagee, or prospective purchaser of a Unit, delivered personally or sent by certified mail, first-class postage prepaid, return receipt requested to the Association's registered agent or designee, the Association shall issue a written statement setting forth the amount of any unpaid assessments with respect to such Unit, the amount of current periodic assessments and the date on which such assessment becomes or became due, and any credit for advanced payments or prepaid items. Such statement shall be delivered personally or by certified mail, first-class postage prepaid, return receipt requested, or by such other means as may be stated in the request.

The Association may require the payment of a reasonable processing fee for issuance of such statement. Such statement shall be binding upon the Association as to Persons who rely thereon in good faith.

R2005087950_ 37

**12.7. Lien for Assessments.**

(a) *Existence of Lien.* The Association shall have a lien against each Unit to secure payment of assessments, as well as interest, late charges (subject to the limitations of Illinois law), and costs of collection (including attorneys fees and expenses). Such lien shall be superior to all other liens, except (i) liens and encumbrances recorded prior to this Charter and which the Association has assumed or taken subject to; (ii) the liens of all real estate taxes and other governmental assessments or charges, and (iii) the lien or charge of any Mortgage made in good faith and for value having first priority over any other Mortgages on the Unit and recorded prior to the assessment becoming delinquent.

The Association may, as further evidence and notice of the lien, execute and record a document setting forth as to any Unit the amount of the delinquent sums due the Association at the time such document is executed and the fact that a lien exists to secure the repayment thereof. However, the failure of the Association to execute and record any such document shall not affect the validity, enforceability, or priority of the lien.

(b) *Enforcement of Lien.* The Association may bid for the Unit at the foreclosure sale and acquire, hold, lease, mortgage, and convey the Unit, subject to the Owner's right of redemption, if any, under Illinois law. While a Unit is owned by the Association following foreclosure: (i) no right to vote shall be exercised on its behalf; (ii) no assessment shall be levied on it; and (iii) each other Unit shall be charged, in addition to its usual assessment, its pro rata share of the assessment that would have been charged such Unit had it not been acquired by the Association. The Association may sue for unpaid assessments and other charges authorized hereunder without foreclosing or waiving the lien securing the same, in addition to pursuing any and all remedies allowed by law to enforce the lien.

> In order to secure the obligation of each Owner to pay its share of Association expenses, the Association has a lien against each Unit. If an Owner does not pay his or her assessments on time, the Association may foreclose the lien on such Owner's Unit, causing it to be sold to pay the past due assessments. The Association may also sue an Owner in court to recover past due assessments.

(c) *Effect of Sale or Transfer.* Sale or transfer of any Unit shall not affect the assessment lien or relieve such Unit from the lien for any subsequent assessments. However, the sale or transfer of any Unit pursuant to foreclosure of a first Mortgage having priority over the Association's lien pursuant to Section 12.7(a) shall extinguish the lien as to any installments of such assessments due prior to the Mortgagee's foreclosure. The subsequent Owner of the foreclosed Unit shall not be personally liable for assessments on such Unit due prior to such acquisition of title. Such unpaid assessments shall be deemed to be Common Expenses collectible from Owners of all Units subject to assessment under Section 12.5, including such acquirer, its successors and assigns.

**12.8. Exempt Property.**

The following property shall be exempt from payment of Base Assessments and Special Assessments:

(a) All Common Area and such portions of the property owned by the Founder or a Founder Affiliate as are included in the Area of Common Responsibility; and

(b) Any property dedicated to and accepted by any governmental authority, public school, or public utility.